COPY

1  VAHN ALEXANDER (167373)
   valexander@faruqilaw.com
2  **FARUQI & FARUQI, LLP**
   1901 Avenue of the Stars, Second Floor
3  Los Angeles, CA 90067
   Telephone:.310/461-1426
4  Facsimile:  310/461-1427

5  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
6  RACHELE R. RICKERT (190634)
   rickert@whafh.com
7  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
8  PATRICK H. MORAN (270881)
   moran@whafh.com
9  **WOLF HALDENSTEIN ADLER**
10   **FREEMAN & HERZ LLP**
   750 B Street, Suite 2770
11 San Diego, CA 92101
   Telephone:  619/239-4599
12 Facsimile:  619/234-4599

13 *Attorneys for Plaintiffs*

14 [Additional counsel appear on signature page]

15

16

FILED
CLERK, U.S. DISTRICT COURT
NOV 12 2010
CENTRAL DISTRICT OF CAL
BY

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

19 JOHN F. KENNEDY and RAHMAN J.
   MOGHADDAM,                              Case No. **CV10-8665** (RSWL-RZx)
20
                Plaintiffs,               **COMPLAINT FOR VIOLATIONS**
21                                        **OF SECTIONS 14(a) AND 20(a) OF**
       v.                                 **THE SECURITIES EXCHANGE**
22                                        **ACT OF 1934, 15 U.S.C. §§ 78N(a)**
   OCCAM NETWORKS, INC., ROBERT            **AND 78t(a)**
23 L. HOWARD-ANDERSON, STEVEN
   M. KRAUSZ, ROBERT B. ABBOTT,           **JURY DEMAND**
24 ROBERT E. BYLIN, THOMAS E.
   PARDUN, ALBERT J. MOYER,
25 BRIAN H. STROM, CALIX, INC.,
   OCEAN SUB I, INC., and OCEAN SUB
26 II, LLC, inclusive,
27                Defendants.
28

Plaintiffs John F. Kennedy and Rahman J. Moghaddam ("Plaintiffs"), by their attorneys, make the following allegations based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which is based on personal knowledge.

## SUMMARY

1.      Plaintiffs bring this action against Defendants Occam Networks, Inc. ("Occam" or the "Company") and its Board of Directors (the "Board" or "Occam Board"), for violations of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act), 15 U.S.C. §§ 78n(a) and 78t(a), arising out of the agreement and recommendation to sell Occam to Calix, Inc. ("Calix") by means of an unfair process at an unfair price of approximately $7.75 per share in a stock and cash transaction and without adequate disclosure (the "Proposed Acquisition").

2.      Specifically, on September 16, 2010, Occam and Calix announced that the companies had entered into a definitive Agreement and Plan of Merger and Reorganization (the "Merger Agreement") whereby Calix would acquire all of the outstanding stock of Occam through its wholly owned subsidiaries Ocean Sub I, Inc. and Ocean Sub II, LLC.   Under the terms of the Merger Agreement, Occam shareholders will receive $3.8337 in cash and 0.2925 of a Calix share per Occam share.  Upon completion of the Proposed Acquisition, Occam shareholders will own between 16.5% and 18.9% of the combined company.   Calix announced that it expects the Proposed Acquisition to close in the fourth quarter of 2010 or the first quarter of 2011.

3.      In an attempt to co-opt shareholder approval of the unfair Proposed Acquisition, Defendants caused to be filed with the Securities and Exchange Commission ("SEC") a false and misleading registration statement, Form S-4, on November 2, 2010, which also serves as the proxy for the required vote by Occam's

shareholders.[1] *See* Calix, Inc., Registration Statement (Form S-4) (Nov. 2, 2010) (the "Registration Statement"). Among other things, the Registration Statement misstates and/or omits material information concerning: (1) any projections beyond fiscal year 2011 that were prepared and shown to the Occam Board as part of the Board's deliberations; (2) the reasons why shareholders are not presented with the most valuable and important metric in evaluating the desirability of a merger, a discounted cash flows ("DCF") analysis; (3) the full nature and extent of the conflicts which burden the Board's financial advisor, Jefferies & Company, Inc. ("Jefferies"), including the amount and nature of the fee to be paid Jefferies upon the close of the Proposed Acquisition; (4) the full nature of the strategic alternatives that Jefferies identified for the Board and the reasons why the Board chose not to pursue those alternatives; (5) the reasons why the Board decided not to conduct a full auction and failed to provide for any post-market check or other mechanism by which Occam shareholder could be sure they are being provided the best value possible for their shares and loss of control of Occam; and (6) the identity, disposition and material terms of the offers which were submitted to the Board by the parties identified as "Party A," "Party B" and the other "potential acquisition candidate" in the Registration Statement. The material misstatements and omissions contained in the Registration Statement constitute violations of §§ 14(a) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a).

## JURISDICTION AND VENUE

4. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C § 1331 in that Plaintiffs' claims arise under the Constitution and laws of the United States, including the Exchange Act (15 U.S.C. §78aa *et seq.*) and 28 U.S.C. § 1331.

---

[1] The Registration Statement (defined *infra*) itself acknowledges that it will serve as the proxy statement for Occam shareholders by describing the document as a "proxy statement/prospectus." Registration Statement at *1.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the Defendants, including Occam, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District.  Finally, the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

6.    Plaintiffs John F. Kennedy and Rahman J. Moghaddam ("Plaintiffs") are, and have been at all relevant times, the owners of shares of common stock of Occam.

7.    Occam is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal corporate offices at 6868 Cortona Drive, Santa Barbara, California 93117.  Occam develops markets and supports broadband access products designed to enable telecom service providers to offer bundled voice, video and high speed internet, or "Triple Play," services over both copper and fiber optic networks.  Occam common stock trades on the NASDAQ Exchange under the ticker symbol "OCNW."

8.    Defendant   Robert L. Howard-Anderson   ("Howard-Anderson")   has served as president and chief executive officer ("CEO") of the Company since May 2002, and as a director of the Company since July 2002.  Howard-Anderson was senior vice president of product operations at Occam CA, one of Occam's predecessor companies, from February 2002 to May 2002.

9.    Defendant Steven M. Krausz ("Krausz") has served as a director of the Company since May 1997 and has served as chairman since May 2002.  Krausz also served as a director of Occam CA from February 2000 to May 2002 and served as its chairman from March 2002 until the closing of the merger with Accelerated Networks, Inc.  Krausz has been a managing member of several venture capital funds affiliated with U.S. Venture Partners, a venture capital firm, since August 1985.  As

- 3 -

of March 29, 2010, U.S. Venture Partners and its affiliates beneficially owned 3,172,497 shares of Occam stock, or 15.1% of the outstanding stock of the Company.

10.    Defendant Robert B. Abbott ("Abbott") has served as a director of the Company since May 2002.  He served as a director of Occam CA, from February 2001 to May 2002.  Abbott is currently a general partner with Norwest Venture Partners, a venture capital firm he has been with since August 1998.  As of March 29, 2010, Norwest Venture Partners and its affiliates beneficially owned 2,057,123 shares of Occam stock, or 9.8% of the outstanding stock of the Company.  Abbott also serves as a director for several private companies.

11.    Defendant Robert E. Bylin ("Bylin") has served as a director of the Company since September 2004.  Bylin has served as the chief financial officer of SpectraLinear Inc., a timing solutions company, since October 2006.  From November 2005 to October 2006, Bylin served as a consultant to SpectraLinear, Pyxis Technology, Inc., an electronic design automation company, and TAK Imaging, a provider of imaging processors.  From April 2004 to November 2005, Bylin served as the chief financial officer of TAK Imaging.  From March 2001 to October 2003, Bylin served as chief financial officer and chief operations officer for D.T. Consulting, a consulting company specializing in technical integration of hardware and software systems.  Prior to that, Bylin served as chief financial officer and vice president of finance for Veridicom, Inc., a semiconductor and software company.  Bylin currently serves as a director for Technology Credit Union.

12.    Defendant Thomas E. Pardun ("Pardun") has served as a director of the Company since September 2004.  Since April 2007, Pardun has served as chairman of the board of directors of Western Digital Corporation, a manufacturer of hard-disk drives for the personal computer and home entertainment markets.  Pardun previously served as chairman of Western Digital from January 2000 to November 2001, and has served as a director of Western Digital since January 1993.  In July 2000, Pardun retired as president of MediaOne International, Asia-Pacific (formerly US West Asia-

- 4 -

Pacific), an owner/operator of international properties in cable television, telephone services, and wireless communications. Prior to that, Pardun served as president and chief executive officer of US West Multimedia Communications, Inc. and held numerous other executive positions with US West. Prior to joining US West, Pardun was president of the Central Group for Sprint as well as president of Sprint's West Division. Pardun also served as senior vice president of United Telecommunications, a predecessor company to Sprint. In addition to Western Digital Corporation and Occam, Pardun serves on the boards of CalAmp Corporation, Finisar Corporation, Megapath, Inc. and MaxLinear, Inc.

13. Defendant Albert J. Moyer ("Moyer") was appointed as a director of the Company on November 29, 2007. Moyer is a business consultant. Moyer served as executive vice president and chief financial officer of QAD Inc., a publicly held software company that is a provider of enterprise resource planning software applications, from March 1998 until February 2000, and he subsequently served as a consultant to QAD, assisting in the Sales Operations of the Americas Region. From February to July 2000, Moyer served as president of the commercial division of Profit Recovery Group International, Inc. (now known as PRG-Schultz International, Inc.), a publicly held provider of recovery audit services. Prior to joining QAD in 1998, Moyer served as chief financial officer of Allergan Inc., a specialty pharmaceutical company based in Irvine, California, from 1995 to 1998. Previously, Moyer served as chief financial officer of National Semiconductor Corporation, a semiconductor company. Moyer also served as chief financial officer of Western Digital Corporation, a manufacturer of hard-disk drives for the personal computer and home entertainment markets. Moyer also serves on the board of CalAmp Corp., a provider of wireless communications solutions, Collectors Universe, Inc., a third-party grading and authentication services of high-value collectibles, Virco Manufacturing Corporation, LaserCard Corporation, a provider of secure identification solutions and MaxLinear, Inc., a provider of radio-frequency and mixed signal semiconductor

solutions.

14.     Defendant Brian H. Strom ("Strom") was appointed as a director of the Company on May 17, 2006.  Strom served as president and chief executive officer of SureWest Communications from December 1993 to December 2005 and as a director of SureWest from December 1993 to May 2006.  Strom served as chairman of the United States Telecom Association from October 2003 to October 2004.  Strom also served as chair of the Sacramento Area Commerce and Trade Organization from July 2003 to July 2004, and served as chairman of the California Communications Association from February 2001 to February 2002.

15.     Defendants Howard-Anderson, Krausz, Abbott, Bylin, Pardun, Moyer and Strom are sometimes collectively referred to herein as the "Individual Defendants."

16.     Defendant Calix is a Delaware corporation with its headquarters located at 1035 N. McDowell Boulevard, Petaluma, California 94954.  Calix is a self proclaimed leading provider in North and Latin America of broadband communications access systems and software for copper- and fiber-based network architectures that enable communications service providers to connect to their residential and business subscribers. Calix enables communications service providers to provide a wide range of revenue-generating services, from basic voice and data to advanced broadband services, over legacy and next-generation access networks. Calix stock is traded on the New York Stock Exchange under the ticker symbol "CALX."

17.     Defendant Ocean Sub I, Inc., is a Delaware corporation formed solely for the purpose of entering into the Proposed Acquisition, and is a wholly owned subsidiary of Calix.

18.     Defendant Ocean Sub II, LLC is a Delaware limited liability company formed solely for the purpose of entering into the Proposed Acquisition, and is a wholly owned subsidiary of Calix.

19. Calix, along with Ocean Sub I, Inc., and Ocean Sub II, LLC are collectively referred to herein as the "Calix Group" or "Calix."

20. All defendants are sometimes collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Occam's Background and its Potential for Growth

21. Occam develops, markets and supports broadband access products designed to enable telecom service providers to offer bundled voice, video and high speed internet, or "Triple Play," services over both copper and fiber optic networks. The Company's core product line is the Broadband Loop Carrier, or BLC, an integrated hardware and software platform that uses Internet Protocol, or IP, and Ethernet technologies to increase the capacity of local access networks, enabling the delivery of advanced Triple Play services. The Company also offers a family of Optical Network Terminals, or ONTs for fiber optic networks, remote terminal cabinets, and professional services.

22. Occam markets its products through a combination of direct and indirect channels. These sales efforts are focused on the North American independent operating company, or IOC, segment of the telecom service provider market. These are companies that never were a part of the original Bell System. Recently, the Company has expanded its sales activities to include Europe, the Middle East, Africa, the Caribbean, Latin America, the Pacific Islands and certain other international locations. As of December 31, 2009, the Company shipped its BLC platform to over 350 telecommunications customers.

23. In recent years, the number of broadband subscribers has increased significantly on a worldwide basis. This growth has been driven, in large part, by increasing demand for bandwidth intensive applications, such as music and video downloads, electronic commerce, telecommuting and online gaming. In addition, services are increasingly being delivered over broadband networks using IP, the

underlying communications technology of the Internet. For example, Voice over Internet Protocol, or VoIP, services are now widely available to consumers, and many telecom service providers have announced or initiated plans to offer Internet Protocol television, or IPTV, services to their subscribers. The rapid growth in broadband subscribers, coupled with the growing amount and diversity of IP-based services, has strained the capacity of many traditional telecommunications networks. Capacity constraints are being exacerbated as high-definition television, or HDTV, and other bandwidth-intensive services become more prevalent. This rapid growth in IP-based communications traffic is prompting many telecom service providers to modify their network architectures and substantially upgrade the capacity of their networks.

24.     In response to increased competition and pricing pressure for standalone voice services, many telecom service providers are seeking to offer Triple Play services, which provides them with the opportunity to increase revenue per subscriber, create flexible pricing plans and promotions, improve customer loyalty and offer the convenience of a single bill, among other benefits. While traditional voice and data services leave little room for differentiation, and the prices of these services are decreasing steadily, video represents an important source of spending by consumers and has therefore emerged as a critical Triple Play offering. Once largely the domain of broadcasters, cable operators and satellite providers, video is increasingly viewed by telecom service providers as an essential element of their business plans. Because traditional telecom networks were not designed to carry video traffic, however, telecom service providers must substantially upgrade the capacity, quality and design of their networks in order to deliver IPTV and other broadband services.

25.     To fulfill the Company's strategy, Occam has invested substantial funds in research and development. As a result of the growing market and Occam's strategy as well as its investment in research, the Company is currently poised for substantial growth. Indeed, in announcing the Company's financial results for 2009,

1  Defendant Howard-Anderson stated:

2  　　　During 2009 we strengthened Occam's competitive position through
3  　　　successful product introductions and a new international sales presence.
4  　　　We also continued to emphasize operational efficiencies.  Combined,
5  　　　these efforts improved our ability to pursue new and existing customer
6  　　　opportunities for broadband service deployments.

7  Press Release, Occam Networks, Inc., Occam Networks Announces Fourth-Quarter
8  2009 Results (Feb. 18, 2010) (available at http://occamnetworks.com/news/
9  pressreleases/pressrelease.php?ID=286).

10  　　　26.　　On July 29, 2010, the Company announced its financial results for the
11  second quarter of 2010 which included increased revenue of $23.8 million, compared
12  with $22.3 million for the first quarter of 2010 and $21.0 million for the second
13  quarter of 2009.  Occam also announced increased gross margins of $9.8 million, or
14  41% of revenue, compared with $8.0 million, or 38% of revenue for the second
15  quarter of 2009.

16  　　　27.　　With respect to these results, Defendant Howard-Anderson stated:

17  　　　This quarter marked the start of first revenue shipments on
18  　　　stimulus-related customer orders.  Service providers who have secured
19  　　　government funding are now moving ahead with their plans, and we
20  　　　look forward to the continued adoption of Occam solutions into their
21  　　　network plans.

22  Press Release, Occam Networks, Inc., Occam Networks Announces Second-Quarter
23  2010 Results (July 29, 2010) (available at http://www.occamnetworks.com/news/
24  pressreleases/pressrelease.php?ID=307).

25  　　　28.　　Rather than permitting the Company's shares to trade freely and
26  allowing its shareholders to reap the benefits of the Company's investment in
27  research and its increasingly positive prospects due in part to stimulus-related
28  customer orders, the Individual Defendants have acted for their own benefit and the

- 9 -

benefit of Calix, and to the detriment of the Company's shareholders, by entering into the Merger Agreement.   In so doing, the Individual Defendants have effectively placed a cap on Occam's corporate value at a time when the Company's stock price was still suffering the effect of the lingering downturn in the economy, but when it was poised to capitalize on its investment in research, the benefits of economic stimulus spending and the Company's resultant positive and encouraging financial outlook.

29.   Despite the Company's positive outlook for growth, Occam agreed to enter into the Proposed Acquisition.  In a press release dated September 16, 2010, the Company announced that it had entered into a merger agreement with Calix, stating:

> PETALUMA, CA and SANTA BARBARA, CA – September 16, 2010 – Calix, Inc. (NYSE: CALX) and Occam Networks, Inc. (NASDAQ: OCNW) today announced that the companies have entered into a definitive agreement for Calix to acquire Occam Networks in a stock and cash transaction valued at approximately $171 million, which is approximately $7.75 per outstanding share of Occam Networks stock.

> Upon the completion of the acquisition, each outstanding share of Occam Networks common stock (other than those shares with respect to which appraisal rights are available, properly exercised and not withdrawn) will be converted into the right to receive (a) $3.8337 per share in cash, without interest plus (b) 0.2925 of a validly issued, fully paid and non-assessable share of Calix common stock.   After the completion of the acquisition, former Occam Networks stockholders will own between 16.5 percent and 18.9 percent of the outstanding shares of Calix's common stock based on the number of Calix share outstanding as of September 15, 2010.

> Additionally, after the completion of the acquisition, one non-

management member of the current Occam Networks Board of Directors is expected to be appointed for election to serve on the Calix Board of Directors.

The combined organization of Calix and Occam Networks is expected to provide communications service providers across North America, the Caribbean, Latin America, and select global markets with an enhanced portfolio of advanced broadband access systems, and accelerate innovation across the expanded Calix Unified Access portfolio.   The acquisition is expected to result in more access options over both fiber and copper for communications service providers to deploy, which could expedite the proliferation of advanced broadband services to both residential and business subscribers, including such services as high-speed Internet, IPTV, VOIP, Ethernet business services, and other advanced broadband applications.

"The rate of change is accelerating for communications service providers, and Calix is fully committed to providing our customers with the broadest portfolio of innovative access network options to adapt to this changing world," said Carl Russo, president and chief executive officer of Calix. "By combining Occam Networks' expertise in IP and Ethernet, Calix's strength in fiber access, and both companies' experience in copper access, we believe there is a clear opportunity to further enhance the Calix Unified Access portfolio, accelerate its future innovation, and enable greater broadband deployment by communications service providers globally.   As a result of this acquisition, communications service providers can expect new innovations to the expanded Calix Unified Access portfolio that directly address the emerging needs of the broadband-connected consumer while

also making these communications service providers more capitally and operationally efficient.  We are excited about what this combination of top engineering and support talent will mean to bringing new and accelerated access network innovation to our joint customers and communications service providers."

"With more than 380 communications service providers as customers and a robust access systems portfolio, Occam Networks has become synonymous with IP and Ethernet access innovation, yet with the rate of change in our industry continuing to increase, we were looking for ways to accelerate our rate of innovation," said Bob Howard-Anderson, Occam Networks' president and chief executive officer.  "By combining our extensive IP and Ethernet access platforms and resources with Calix's robust Unified Access portfolio and deep expertise in fiber access, we lay a foundation for extensive future innovation.  We are excited about the opportunity to combine forces with Calix, and with the cultures of continued innovation and commitment to customer success that both companies share, we believe we can bring accelerated access network innovation and opportunity to communications service providers, consumers, and businesses alike."

Calix expects to complete the acquisition in the fourth quarter of 2010 or first quarter of 2011, subject to Occam Networks stockholder approval, receipt of required regulatory clearance and the satisfaction of certain other customary closing conditions.  Occam Networks stockholders representing approximately 27% percent of Occam Networks' outstanding common stock have signed an agreement to vote their shares in favor of this transaction.  It is anticipated that the acquisition will be accretive to Calix's non-GAAP earnings per share in the second quarter

1  of 2011.

2  Press Release, Occam Networks, Inc., Calix to Acquire Occam Networks (Sept. 16,

3  2010) (available at http://www.occamnetworks.com/news/pressreleases/pressrelease.

4  php?ID=313).

5      30.    In discussing the Proposed Acquisition during a conference call with

6  analysts, Calix's CEO again emphasized the importance of the acquisition, stating:

7      In short, we believe that the acquisition of Occam Networks, in

8      particular the combination of its deeply experienced Ethernet access

9      engineering team with our already strong and innovative engineering

10     resources, will allow us to accelerate our Unified Access roadmap, and

11     as a direct result accelerate our customers' ability to successfully deliver

12     advanced broadband services to their subscribers and become the

13     broadband service provider of choice in their respective markets.

14     Furthermore, we expect that by significantly benefiting our customers

15     we will also benefit our stockholders and our partners.

16                      *        *        *

17     In sum, this transaction brings two extremely strong and talented

18     engineering teams together and we intend to accelerate development on

19     our existing and acquired platforms.    We believe the combined

20     experience, resources, and aggregate R&D budget of over 16 million

21     dollars per quarter focused on access, will accelerate innovation and

22     time-to-market across the expanded Unified Access portfolio, and

23     provide clear benefits to our customers.

24  Calix, Inc., Calix Acquisition of Occam Networks Call (Form 425), at 2-3 (Sept. 17,

25  2010).

26  ***The Proposed Acquisition is Unfair***

27      31.    Unlike the vast benefits to be received by Defendants in the Proposed

28  Acquisition, the consideration to be received by the Company's shareholders is

- 13 -

inadequate.  The Proposed Acquisition purports to represent a premium of 47% based on Occam's closing price the day prior to the announcement of the Proposed Acquisition, but in fact represents a paltry 12% based on the $6.77 price Occam traded at as recently as July 29, 2010, when the Company released its most recent financial results.  Moreover, on December 21, 2009, a Bloomberg article entitled *CEOs paying 56% M&A Premium Shows Stocks May be Cheap*, reported that "[t]he average premium in mergers and acquisitions in [2009 in] which U.S. companies were the buyer and seller rose to 56% this year from 47 percent last year [2008]…" Thus, the Proposed Acquisition premium is well below the average premium in like transactions during 2009.

32.    Further, the trading price of Calix common stock has increased by 30.9% since August 20, 2010 to trade at its highest price in four and one-half months. Nevertheless, the Individual Defendants failed to negotiate any protection against the decline in the Calix stock component of consideration offered to shareholders in the Proposed Acquisition, or even the right to terminate the Proposed Acquisition in the event Calix stock trades below a certain level.  Indeed, following the announcement of the Proposed Acquisition, Calix stock opened $0.10 lower, and has declined by over $0.55 per share in the first day of trading following the announcement.  If the Proposed Acquisition is not enjoined, Occam shareholders are left with Calix stock at whatever price it has declined to at the time of closing, even if that price reflects a significant discount to the price at the time of announcement.

33.    Further, the consideration offered to Occam shareholders in the Proposed Acquisition fails to adequately take into account the tremendous growth prospects for Occam.  For example, according to Thomson/First Call, at least one Wall Street analyst had a price target of $8.00 per share before the Proposed Acquisition.

34.    Given the Company's recent performance and future prospects, the consideration shareholders are to receive in the Proposed Acquisition is inadequate.

- 14 -

1   Thus, the Individual Defendants have failed to maximize value for Plaintiffs and
2   Occam's other public shareholders.

3   ***Financial Benefits Received by the Individual Defendants***

4          35.     Despite their duty to maximize shareholder value, certain of the
5   Individual Defendants have clear and material conflicts of interest and are acting to
6   better their own interests at the expense of Plaintiffs and Occam's other public
7   shareholders.

8          36.     For example, Defendants Krausz and Abbott are principals at venture
9   capital firms which hold large, highly illiquid blocks of Occam stock. Krausz is a
10   managing member of several venture capital funds affiliated with U.S. Venture
11   Partners, which currently own 3,172,497 shares of Occam stock, or 15.1% of the
12   outstanding stock of the Company. Likewise, Abbott is general partner with Norwest
13   Venture Partners, which with its affiliates own 2,057,123 shares of Occam stock, or
14   9.8% of the outstanding stock of the Company.   To insure that a liquid market is
15   created for these large blocks of Occam stock, Krausz, U.S. Venture Partners, Abbott,
16   and Norwest Venture Partners, together with the other Individual Defendants,
17   concurrently with the Merger Agreement, negotiated and executed a Support
18   Agreement whereby they committed to cast their votes in favor of the Proposed
19   Acquisition.   Collectively, the Individual Defendants, U.S. Venture Partners and
20   Norwest Venture Partners hold 27.1% of the Company's outstanding stock.
21   Therefore, Defendants only need to obtain approval of the Merger Agreement by less
22   than 23% of the Company's public shareholders.

23          37.     In anticipation of the Proposed Acquisition, Defendants Krausz and
24   Abbott further negotiated amendments to their respective Indemnification
25   Agreements with the Company on August 11, 2010, which makes the Company's
26   indemnification obligations to Abbott and Krausz primary to the indemnification
27   obligations of each director's respective venture capital firm.

28

38.     In addition, Howard-Anderson negotiated an amendment to his Change of Control Severance Agreement which, upon a change of control, entitles him to receive "a lump sum cash payment equal to twelve (12) months of the Executive's annual base salary" and additional benefits, which, in 2009, totaled $566,041.  This is in addition to the immediate vesting and liquidation of his Occam stock options and restricted stock.

39.     Further, one of the Individual Defendants, who has yet to be identified, has been promised a position as director of Calix, together with all of the benefits and emoluments of the office, following the consummation of the Proposed Acquisition.

***The Preclusive Deal Protection Devices***

40.     On September 16, 2010, the Company filed a Form 8-K with the SEC wherein it disclosed the terms of the Merger Agreement.  As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company.  *See* Occam Networks, Inc., Current Report (Form 8-K) (Sept. 16, 2010).

41.     By way of example, section 6.03(b) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by Calix.  *See* Occam Networks, Inc., Current Report (Form 8-K), Ex. 2.1 at 60 (Sept. 16, 2010). Section 6.03(a) of the Merger Agreement further demands that the Company terminate any and all prior or ongoing discussions with other potential suitors.  Despite the fact that Defendants have already "locked up" the transaction in favor of Calix and precluded Occam's Board from soliciting alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be Calix. *See id.*

42.     Pursuant to section 6.03(c) of the Merger Agreement, should an unsolicited bidder arise, the Company must notify Calix of the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, Calix is

granted four days to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid ceases to constitute a superior proposal. Calix is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer. *See* Occam Networks, Inc., Current Report (Form 8-K), Ex. 2.1 at 61 (Sept. 16, 2010).

43.    Accordingly, the Merger Agreement unfairly assures that any "auction" will favor Calix and piggy-back upon the due diligence of the foreclosed second bidder.

44.    In addition, the Merger Agreement provides that Occam must pay to Calix a termination fee of $5,200,000 plus all fees and expenses incurred by Calix in conjunction with the Proposed Acquisition if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

45.    Ultimately, these preclusive deal protection devices illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions will foreclose the new bidder from providing the needed market check of Calix's inadequate offer price.

## THE MATERIALLY MISLEADING AND/OR INCOMPLETE REGISTRATION STATEMENT

56.    In order to secure shareholder approval of this unfair deal, Defendants filed with the SEC a materially misleading and incomplete Registration Statement on November 2, 2010. The Registration Statement, which recommends that Occam's shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents

material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company. Specifically the Registration Statement omits/or misrepresents the material information set forth below in contravention of sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a).

57. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with false and materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Acquisition.

58. The Registration Statement indicates that Occam management failed to conduct any financial projections for Occam beyond the year 2011, and fails to explain why those projections were not conducted and provided to Jefferies, Occam's financial advisor. Registration Statement at 95.

59. The Registration Statement does not describe in sufficient detail the sales process leading up to the Proposed Acquisition. For example, the Registration Statement describes that in early June 2009, Occam retained Jefferies to explore strategic alternatives, which included acquiring other companies, but does not state whether the Board considered any other financial advisors or the criteria used by the Board to select Jefferies. Registration Statement at 73.

60. In addition, the Registration Statement fails to fully disclose the conflicts which burdened the Board and Jefferies throughout the sale process. The Registration Statement indicates that Occam has agreed to pay a fee to Jefferies for its services based, in part, upon the value of the consideration to be paid in the merger, but fails to disclose the amount of the fee. Registration Statement at 102. In addition, the Registration Statement indicates that Jefferies performed work in the past for Calix, but fails to explain the extent of that work or any work which has been promised to Jefferies following the consummation of the Proposed Acquisition. *See id.*

61.   Further, in early August 2009, Jefferies and Occam's management prepared a list of 19 potential companies that Occam might be interested in acquiring. The Registration Statement, however, fails to disclose the criteria used to prepare and select the companies on the list.   Registration Statement at 74.   The Registration Statement then explains that Jefferies contacted certain of the identified companies but fails to state the reason not all 19 companies were contacted, how many were actually contacted and whether the Board approved the restricted contact list.   The Registration Statement also fails to disclose the identity, disposition and material terms offered by the parties that were interested in bidding – or did bid – on Occam, including the entities identified as "Party A," "Party B," and the other "potential acquisition candidate." *Id. et seq.*

62.   Suddenly, on April 1, 2010, the Board determined that Jefferies should be retained to assist in the sale of the Company.  The Registration Statement fails to describe the reasons Occam suddenly became the target of a sale instead of the acquiring party.   More troubling, the Registration Statement fails to state why Jefferies was now engaged to sell the Company.  Registration Statement at 77.

63.   Moreover, the "fairness opinion" prepared by Jefferies is plagued with materially false statements and omissions. The opinion of Jefferies fails to disclose information which would allow shareholders to intelligently determine whether or not they should vote in favor of the Proposed Acquisition.  Registration Statement at 97-102.  In particular, the Registration Statement is deficient and should provide, *inter alia*, the following:

1)   A description of the criteria and multiples observed by Jefferies for each company in the *Comparable Public Company Analysis* for Occam and Calix.  Further, a description of the criteria used to select the reference ranges used in the analysis;

2)   A description of the criteria and multiples observed by Jefferies for each company in its *Comparable Transaction Analysis* for Occam. Further, a description of the criteria used to select the reference range used in the analysis;

3)   a description of the criteria, companies and multiples observed by Jefferies for each company in its *Premiums Paid Analysis* for Occam;

4)   the identity of the "various equity research analysts" and their respective share price targets for Calix observed by Jefferies in its *Equity Research*;

5)   the reason Jefferies failed to include a the most important single piece of information for shareholders considering the sale of their stock, a DCF analysis. Further, if a DCF analysis was performed, the Registration Statement omits any reference to such an analysis, the results of the analysis and the reasons for not including the analysis in the Registration Statement; and

6)   a description of any other analyses performed by Jefferies in rendering its "fairness opinion" and an explanation as to why those other analyses were not included in the Registration Statement.

46.   Accordingly, because the foregoing material misstatement and omission represent a violation of federal law, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## DEFENDANTS' DUTIES UNDER STATE LAW

47.   By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiffs and the

- 20 -

other public shareholders of Occam and owe them, as well as the Company, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure, as well as a duty to maximize shareholder value.

48.    Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.   To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

        a.     adversely affects the value provided to the corporation's shareholders;

        b.     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

        c.     contractually prohibits them from complying with their fiduciary duties;

        d.     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

        e.     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

49.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Occam, are obligated to refrain from:

        a.     participating in any transaction where the directors or officers' loyalties are divided;

b.     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c.     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

The Individual Defendants are also obliged to honor their duty of candor to Occam's shareholders by, *inter alia*, providing all material information to the shareholders regarding a scenario in which they are asked to vote their shares.  This duty of candor ensures that shareholders have all information that will enable them to make informed, rational and intelligent decisions about whether to relinquish their shares in exchange for the consideration offered. Further, Defendants are obliged by federal law to provide all material information in their filings with the SEC related to the Proposed Acquisition.

50.    Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to Plaintiffs and other shareholders of Occam, or are aiding and abetting others in violating those duties.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

51.    In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

52.    During all relevant times hereto, Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Calix to attempt to eliminate the shareholders' equity interest in Occam pursuant to a defective sales

process; (ii) permit Calix to buy the Company for an unfair price; and (iii) permit the filing of incomplete and misleading documents with the SEC related to the Proposed Acquisition.  In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

53.    Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLAIMS FOR RELIEF
## COUNT I

### On Behalf of Plaintiffs for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) Against All Defendants

64.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

65.    Defendants have issued the Registration Statement with the intention of soliciting shareholder support for the Proposed Acquisition

66.    Rule 14a-9, promulgated by the SEC pursuant to section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)), provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

67.    Specifically, the Registration Statement violates section 14(a) (15 U.S.C. § 78n(a)) and Rule 14a-9 because it omits material facts, including those set forth

above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

68.     The misrepresentations and omissions in the Registration Statement are material to Plaintiffs, who will be deprived of their entitlement to cast fully informed votes if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Acquisition.  As a direct and proximate result of Defendants' conduct, Plaintiffs will be irreparably harmed.

## COUNT II

**On Behalf of Plaintiffs for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) Against All Defendants**

69.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of Occam within the meaning of section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) as alleged herein. By virtue of their positions as officers and/or directors of Occam, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

71.     Each of the Individual Defendants and Occam were provided with, or had unlimited access to, copies of the Registration Statement and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and

supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were, thus, directly involved in the making of this document.

73.    Occam also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement. Occam, in fact, disseminated the Registration Statement and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Registration Statement to be published to shareholders.

74.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants and Occam were each involved in negotiating, reviewing, and approving the Proposed Acquisition. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants and Occam participated in drafting and/or gave their input on the content of those descriptions.

75.    By virtue of the foregoing, the Individual Defendants and Occam have violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

76.    As set forth above, the Individual Defendants and Occam had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to section 20(a) of the Exchange Act (15 U.S.C. § 78n(a)). As a direct and proximate result of Defendants' conduct, Plaintiffs will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

    (A)    enjoining, preliminarily and permanently, the Proposed Acquisition;

    (B)    awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts; and

    (C)    granting Plaintiffs such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: November 12, 2010

                        **WOLF HALDENSTEIN ADLER**
                         **FREEMAN & HERZ LLP**
                         FRANCIS M. GREGOREK
                         BETSY C. MANIFOLD
                         RACHELE R. RICKERT
                         PATRICK H. MORAN

                         *Rachele R. Rickert*
                         RACHELE R. RICKERT

                         750 B Street, Suite 2770
                         San Diego, CA 92101
                         Telephone: 619/239-4599
                         Facsimile: 619/234-4599

                         **LAW OFFICES OF BRUCE MURPHY**
                         **BRUCE G. MURPHY**
                         265 Llwyds Lane
                         Vero Beach, Florida 32963
                         Telephone: 772/231-4202

                         **ALISON LEFFEW**
                         80 Royal Palm Point # 202
                         Vero Beach, FL 32960-4227
                         Telephone: 772/770-6110

                         *Attorneys for Plaintiff Moghaddam*

1

2

3

4

**FARUQI & FARUQI, LLP**
VAHN ALEXANDER
1901 Avenue of the Stars, Second Floor
Los Angeles, CA  90067
Telephone: 310/461-1426
Facsimile:  310/461-1427

5

6

7

8

**FARUQI & FARUQI, LLP**
NADEEM FARUQI
JUAN E. MONTEVERDE
369 Lexington Ave., Tenth Floor
New York, NY  10017
Telephone:  212/983-9330
Facsimile:   212/983-9331

9

*Attorneys for Plaintiff John F. Kennedy*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OCCAM:17876.CPT